UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

| | |
|---|---|
| NICOLE LYONS, ) | |
| ) | **SECOND AMENDED** |
| Plaintiff, ) | **COMPLAINT** |
| ) | |
| -against- ) | **JURY TRIAL DEMANDED** |
| ) | |
| THE CITY OF NEW YORK; POLICE ) | |
| DETECTIVE ROBERT ROGERS, Shield No. ) | 14 Civ. 10081 (LGS) |
| 2421; POLICE DETECTIVE ANTHONY ELIO, ) | |
| Shield No. 1630; POLICE DETECTIVE MARIA ) | |
| MUNDO, Shield No. 5305; JOHN DOES; ) | |
| RICHARD ROES; TOYS "R" US, INC., d/b/a ) | |
| TOYS "R" US-DELAWARE, INC.; JOSE ) | |
| NIEVES, Store Manager; EVELYN MATEO, ) | |
| Assistant Store Manager; MICHAEL FLANAGAN,) | |
| Market Investigator; ALEX BAKER, Regional ) | |
| Asset Protection Manager; and MICHAEL MOES, ) | |
| ) | |
| Defendants. ) | |

-----------------------------------------------------------X

### PRELIMINARY STATEMENT

1.   This is a civil action in which the plaintiff, NICOLE

LYONS, seeks relief for the defendants' violation of her rights

secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983 and by

the United States Constitution, including its Fourth and

Fourteenth Amendments, and by the laws and Constitution of the

State and City of New York.  The plaintiff seeks damages, both

compensatory and punitive, affirmative and equitable relief, an

award of costs and attorneys' fees, and such other and further

relief as this court deems equitable and just.

1

## JURISDICTION

2.   This action is brought pursuant to the Constitution of the United States, including its Fourth and Fourteenth Amendments, and pursuant to 42 U.S.C. § 1983.  Jurisdiction is conferred upon this court by 42 U.S.C. § 1983 and 28 U.S.C. §§1331 and 1343(a)(3) and (4), this being an action seeking redress for the violation of the plaintiff's constitutional and civil rights.

3.   The plaintiff further invokes this court's supplemental jurisdiction, pursuant to 28 U.S.C. §1367, over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this court that they form part of the same case or controversy.

## JURY TRIAL DEMANDED

4.   Plaintiff demands a trial by jury on each and every one of his claims as pleaded herein.

## VENUE

5.   Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1391 (a), (b) and (c).

## PARTIES

6.   Plaintiff was at all times relevant herein a resident of the State of New York, Bronx County.

7.   Defendant THE CITY OF NEW YORK is and was at all times

2

relevant herein a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant THE CITY OF NEW YORK assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risk attaches to the public consumers of the services provided by the New York City Police Department.

8.  Defendants POLICE DETECTIVE ROBERT ROGERS, POLICE DETECTIVE ANTHONY ELIO, POLICE DETECTIVE MARIA MUNDO, and JOHN DOES are and were at all times relevant herein duly appointed and acting officers, servants, employees and agents of THE CITY OF NEW YORK and/or the New York City Police Department (NYPD), a municipal agency of defendant THE CITY OF NEW YORK.  Defendants POLICE DETECTIVE ROBERT ROGERS, POLICE DETECTIVE ANTHONY ELIO, POLICE DETECTIVE MARIA MUNDO, and JOHN DOES are and were at all times relevant herein acting under color of state law in the course and scope of their duties and functions as officers, agents, servants, and employees of defendant THE CITY OF NEW YORK, were acting for, and on behalf of, and with the power and authority vested in them by THE CITY OF NEW YORK and the New York City Police Department, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.  Defendants POLICE

3

DETECTIVE ROBERT ROGERS, POLICE DETECTIVE ANTHONY ELIO, POLICE DETECTIVE MARIA MUNDO, and JOHN DOES are sued individually.

9.   Defendants RICHARD ROES are and were at all times relevant herein duly appointed and acting supervisory officers, servants, employees and agents of THE CITY OF NEW YORK and/or the New York City Police Department, responsible for the training, retention, supervision, discipline and control of subordinate members of the police department under their command.  Defendants RICHARD ROES are and were at all times relevant herein acting under color of state law in the course and scope of their duties and functions as supervisory officers, agents, servants, and employees of defendant THE CITY OF NEW YORK, were acting for, and on behalf of, and with the power and authority vested in them by THE CITY OF NEW YORK and the New York City Police Department, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.  Defendants RICHARD ROES are sued individually.

10.  At all times herein mentioned, defendant TOYS "R" US, INC., d/b/a TOYS "R" US-DELAWARE, INC.(hereafter "TOYS 'R' US") was and is a foreign business corporation that operated, on the date of Plaintiff's arrest as described herein, a retail store located at 350 Baychester Avenue, Bronx, NY 10475.  It is designated as a foreign business corporation by the NY State Department of State.

11. At all times herein mentioned, defendants JOSE NIEVES,

Store Manager; EVELYN MATEO, Assistant Store Manager; MICHAEL FLANAGAN, Market Investigator; ALEX BAKER, Regional Asset Protection Manager, and MICHAEL MOES were officers or employees of defendant TOYS "R" US, and were acting within the course and scope of their employment with defendant TOYS "R" US.

12.  At all times herein mentioned, defendants JOSE NIEVES, Store Manager; EVELYN MATEO, Assistant Store Manager; MICHAEL FLANAGAN, Market Investigator; ALEX BAKER, Regional Asset Protection Manager, and MICHAEL MOES were acting under color of state law.

13.  At all times herein mentioned, defendants JOSE NIEVES, Store Manager; EVELYN MATEO, Assistant Store Manager; MICHAEL FLANAGAN, Market Investigator; ALEX BAKER, Regional Asset Protection Manager, and MICHAEL MOES, through their ongoing relationship, joint action, and conspiracy with, members of the New York City Police Department, were clothed with, and acted with impunity because they were clothed with and protected by, the authority of state law.

14.  Defendants JOSE NIEVES, Store Manager; EVELYN MATEO, Assistant Store Manager; MICHAEL FLANAGAN, Market Investigator; ALEX BAKER, Regional Asset Protection Manager, and MICHAEL MOES are sued individually.

15.  At all times herein mentioned, defendant TOYS "R" US, its agents, servants and/or employees, including defendants JOSE

5

NIEVES, Store Manager; EVELYN MATEO, Assistant Store Manager; MICHAEL FLANAGAN, Market Investigator; ALEX BAKER, Regional Asset Protection Manager, and MICHAEL MOES, were under an obligation to operate, manage, maintain, and control the premises, and their own and their subordinates' activities and behavior, in a careful, safe, and lawful manner.

16.   At all times herein mentioned, defendant TOYS "R" US was under an obligation to use reasonable care in the hiring, training, retention, and supervision of its employees.

17.   At all times herein mentioned, defendant CITY was under an obligation to use reasonable care in the hiring, training, retention, and supervision of its employees.

## STATEMENT OF FACTS

18.   On December 29, 2013 Plaintiff was an employee of the TOYS "R" US store located at 350 Baychester Ave., Bronx NY.

19.   Plaintiff had worked at the store as a Customer Service Sales Representative for six years, and was an honest and conscientious employee.

20.   Some days prior to December 29, 2013 Plaintiff was questioned in the store Manager's office by, on information and belief, either or both of MICHAEL FLANAGAN, Market Investigator and / or ALEX BAKER, Regional Asset Protection Manager, about certain returns of merchandise to the store, and was told that her name had come up in relation to the returns.

6

21.   Plaintiff did not know anything about the returns, and told FLANAGAN and / or BAKER that.

22.   EVELYN MATEO, an Assistant Store Manager, was present while Plaintiff was questioned in the Manager's office.

23.   On December 29, 2013, at approximately 4 p.m., Plaintiff was attending to a customer when FLANAGAN came up to her and told her to come with him.

24.   FLANAGAN and Plaintiff walked together toward the exit of the store.

25.   FLANAGAN called over POLICE DETECTIVE ROBERT ROGERS, who had been sitting outside of the store in his police car along with POLICE DETECTIVE ANTHONY ELIO.

26.   POLICE DETECTIVE ROBERT ROGERS came over to Plaintiff.

27.   POLICE DETECTIVE ROBERT ROGERS identified himself to Plaintiff, told Plaintiff that she was going to be arrested for in-store thefts, and started cursing at Plaintiff.

28.   It was entirely apparent that FLANAGAN was handing Plaintiff off to POLICE DETECTIVE ROBERT ROGERS according to a pre-arranged plan, and that FLANAGAN's purpose, in whole or in part, in interacting with Plaintiff on December 29, 2013 was to bring her over to, and hand her off to, POLICE DETECTIVE ROBERT ROGERS to be arrested.

29.   On information and belief, DETECTIVE ELIO was aware that DETECTIVE ROGERS was arresting Plaintiff without probable cause, and despite an explicit direction from the Bronx County

District Attorney's Office that Plaintiff was not to be arrested, and did nothing to intervene to prevent DETECTIVE ROGERS from arresting Plaintiff.

30.   According to a TOYS "R" US investigation summary – which was authored by Defendant FLANAGAN, who is listed as the creator of the "case narrative," and as the "owner" - POLICE DETECTIVE ROBERT ROGERS was notified by TOYS "R" US staff (on information and belief FLANAGAN) at 5:00 p.m. on December 29, 2013, and POLICE DETECTIVE ROBERT ROGERS was present at the TOYS "R" US store from 5:30 p.m. to 6:00 p.m.

31.   Plaintiff asked why she was being arrested and protested that she had not done anything wrong.

32.   POLICE DETECTIVE ROBERT ROGERS told Plaintiff, in sum and substance, to get in the fucking car and to shut the fuck up.

33.   Plaintiff was taken to the NYPD 45th Precinct, and placed in a room.

34.   Plaintiff was quickly shown a written statement made by another employee of the store ("Person A" who had been arrested at the store some days earlier, on the day that Plaintiff was questioned by FLANAGAN and / or BAKER in the Manager's office), and was asked by POLICE DETECTIVE ROBERT ROGERS if she knew anything about it.

35.   Plaintiff did not know anything about it, and told POLICE DETECTIVE ROBERT ROGERS that.

36.   DETECTIVE MUNDO then entered the room and questioned

8

Plaintiff, and tried to get Plaintiff to admit to things that Plaintiff had not done.

37.   On information and belief, DETECTIVE MUNDO was aware that DETECTIVE ROGERS had arrested Plaintiff without probable cause, and despite an explicit direction from the Bronx County District Attorney's Office that Plaintiff was not to be arrested, and did nothing to intervene to prevent Plaintiff's continued unlawful arrest and imprisonment.

38.   Plaintiff then sat alone in the room for a period of time, until POLICE DETECTIVE ROBERT ROGERS came back in.

39.   POLICE DETECTIVE ROBERT ROGERS told Plaintiff, in sum and substance, that since she did not know anything, she was fucked and was going to Central Booking.

40.   After a couple of hours at the 45th Precinct, Plaintiff was taken to Bronx Central Booking.

41.   Plaintiff was photographed and fingerprinted at Bronx Central Booking.

42.   Plaintiff was held at Bronx Central Booking until approximately 9 p.m. on December 30, 2013, when she was released without charges.

43.   Some days following her release Plaintiff went to the courthouse and was provided with an Affidavit in Support of Declining / Deferring Prosecution by the District Attorney's office, which is dated "12/30/13, 14:42 [2:42 p.m.]"

44.   The affidavit states that the "Category for Declining / Deferring Prosecution" is that "The People do not have sufficient evidence to prove the defendant committed the crime(s) charged beyond a reasonable doubt.

45.   The affidavit further states, as the "Reason(s) for Declining / Deferring Prosecution", as follows:

> The People are deferring prosecution until such time as a full investigation is concluded by Toys-R-Us and the evidence is provided to this Office for review.
>
> On or about December 26, 2013, co-conspirator [Person A] was arrested [DOCKET # PROVIDED]. No evidence was provided to this Office to corroborate defendant's inculpatory statements.  Detective Robert Rogers was explicitly instructed not to arrest any additional individuals until such time as this Office has had the opportunity to review the evidence provided by Toys-R-Us against co-conspirator [Person A], the defendant, and others. (A representative of Toys-R-Us was similarly instructed.)
>
> At that time, Detective Rogers was also invited to this Office on December 27, 2013, to participate in discussions about the future course of this investigation. The detective indicated he would be present.
>
> On December 27, 2013, Detective Roberts did not appear. Instead, representatives of Toys-R-Us spoke with the assigned assistant district attorney and informed the ADA that the necessary video evidence was still being uploaded by Toys-R-Us corporate headquarters.  The ADA was further informed that the video would have to be analyzed by Toys-R-Us investigators before being turned over to this Office. This Office informed the Toys-R-Us representatives that the People would assist in their investigation and reiterated that no further arrests should be made until that time.

10

On December 29 1 2013, Detective Rogers arrested this
defendant without the permission of this Office. The
case was deferred by the complaint room ADA until this
morning (December 30, 2013) and Detective Rogers was
specifically instructed to bring all supporting
evidence to the assigned ADA.

On December 30, 2013, the assigned ADA met with
Detective Rogers who brought DD5s [Detective's notes];
however, he brought no supporting evidence, either
video or documentary. When asked where the supporting
video surveillance was, Detective Rogers stated in sum
and substance: I SAW IT AND IT ESTABLISHED PROBABLE
CAUSE, SO I MADE AN ARREST. When asked to turn over the
video surveillance that he had seen, Detective Rogers
stated in sum and substance: GET IT, YOURSELF. YOU HAVE
THEIR PHONE NUMBER. When asked why he made an arrest
without consulting this Office, Detective Rogers stated
in sum and substance: I DON'T WORK FOR YOU.

An attempt by the assigned ADA to reach the Toys-R-Us
representative in possession of the video surveillance
failed.

Without viewing the surveillance video and reviewing
the corroborating business records, the People cannot
guarantee the factual accuracy of the complaint or
proceed to the grand jury. For that reason, the case is
being deferred until such time as a proper
investigation has been conducted and the People have
had an opportunity to review the evidence.

46.  Plaintiff had not at any point made any inculpatory
statements.

47.  There is no possibility that any video evidence could
have provided probable cause to arrest Plaintiff, as Plaintiff
had not done anything remotely illegal.

48.  On information and belief, Defendant POLICE DETECTIVE
ROBERT ROGERS never in fact viewed any surveillance video
depicting Plaintiff (if he had, and if he indeed deemed it to be

inculpatory, he would have retained a copy of it as arrest evidence and provided it to the District Attorney's Office).

49.   In fact, the TOYS "R" US investigation summary states, "Is there video of the incident?  Unknown."

50.   Further, no video evidence has been listed or produced as part of TOYS "R" US' Initial Disclosures, or subsequent discovery productions, in this action.

51.   No video evidence was listed or produced as part of The City Defendants' Initial Disclosures in this action either.

52.   The City Defendants have since made a supplemental disclosure of three video clips (on information and belief provided to the City by the Bronx County District Attorney's Office), which show nothing other than Plaintiff doing her job and assisting guests at the customer service desk.

53.   Also produced by the City Defendants as part of those supplemental disclosures are six receipts that supposedly correspond to registry returns that Plaintiff is seen on the videos assisting guests with.

54.   All but one of the receipts for the returns (because they involved amounts above a threshold of some hundreds of dollars) also have a code on them indicating that a number of managers (or assistant managers) specifically approved the returns in question.

55.   On information and belief, those managers (or assistant managers) were not arrested as part of the joint TOYS "R" US and

12

NYPD Operations that led to Plaintiff's arrest, and the arrest of a number of others.

56.   On information and belief, Plaintiff was arrested when it was known by all of the individual defendants that there was no probable cause to believe that she had committed any crime, and despite the Bronx District Attorney's Office's explicit instructions that Plaintiff was not to be arrested.

57.   Plaintiff was arrested, on information and belief, in order to attempt to terrify her and extract thereby whatever information from her that could possibly be garnered, without regard to the known absence of probable cause.

58.   The "case narrative" on the TOYS "R" US investigation summary – which was authored by Defendant FLANAGAN on January 13, 2014 – states as follows:

> On 12/23/13 information was received from an internal interview that TM [Team Member] Nicole Lyons who works at Bay Plaza, Bronx, NY store 6336 was involved in push out activity.  This information was obtained through the apprehension and interview of APS [NAME PROVIDED].  [NAME] provided text messages from his phone implicating Nicole was working another APS [NAME PROVIDED] in allowing push outs to occur in return for payments in the form of SVC cards and cash. This writer along with RAPM Alex Baker spoke to Nicole who denied any involvement. Upon the arrest of [NAME] all information was given to Detective Rogers in the 45 Precinct and District Attorney Hamburg. Both made the decision that based on the information they recieved from [NAME] that they had enough to arrest Nicole. On 12/29/13 this writer met the Detectives at the Bay Plaza Store to speak with Nicole. When this writer approached Nicole she attempted to flea the building and try to escape into a cab. The detectives detained her and brought her back to the 45th precinct for

questioning. Nicole refused to talk or provide any information and requested an attorney. Nicole was charged with Grand Larceny by the Bronx DA. I am still awaiting for an exact total she is charged with. Will update once confirmed.

59.  This case narrative is rife with lies.

60.  On information and belief, there are no text messages even remotely implicating Plaintiff in any criminal activity.

61.  No text messages have been listed or produced as part of either TOYS "R" US', or the City Defendants', Initial (or subsequent) Disclosures in this action.

62.  As stated in the Affidavit in Support of Declining / Deferring Prosecution by the District Attorney's office, which was authored by ADA Hamburgh, a representative of TOYS "R" US (in addition to DETECTIVE ROBERTS) had been "explicitly instructed not to arrest any additional individuals until such time as this Office has had the opportunity to review the evidence provided by Toys-R-Us …," which "evidence" – to the extent any existed - TOYS "R" US and its employees did not provide to the District Attorney's Office.

63.  As also noted on the Affidavit in Support of Declining / Deferring Prosecution by the District Attorney's office, which was authored by ADA Hamburgh:

> [R]epresentatives of Toys-R-Us spoke with the assigned assistant district attorney and informed the ADA that the necessary video evidence was still being uploaded by Toys-R-Us corporate headquarters.  The ADA was further informed that the video would have to be analyzed by Toys-R-Us investigators before being turned over to this Office. This Office informed the Toys-R-Us

14

representatives that the People would assist in their
investigation and reiterated that no further arrests
should be made until that time.

…

An attempt by the assigned ADA to reach the Toys-R-Us
representative in possession of the video surveillance
failed.

64. It is also false that Plaintiff tried to "flea (sic)
the building and try to escape into a cab."

65. It is also false that Plaintiff "was charged with Grand
Larceny by the Bronx DA."

66. As noted above, Plaintiff was released from custody
without any charges.

67. The TOYS "R" US investigation summary states, "Final
Disposition: Arrested and Terminated."

68. There was no legitimate reason to believe that
Plaintiff had engaged in any illegality whatsoever.

69. When Plaintiff was arrested POLICE DETECTIVE ROBERT
ROGERS took her cell phone from her, and did not provide her with
a property voucher.

70. Some days following her release Plaintiff went back to
the 45th Precinct to try to retrieve her phone, but was told that
POLICE DETECTIVE ROBERT ROGERS was out sick.

71. Plaintiff has never received her phone back.

72. A couple of days following her release, Plaintiff sent a
text message to the Store Manager, JOSE NIEVES, asking in sum and
substance if she could come back to work.

15

73.   Plaintiff received no response from JOSE NIEVES, and never returned to her former workplace due to fear and embarrassment.

74.   On information and belief, Defendants MICHAEL FLANAGAN and ALEX BAKER collaborated with members of the NYPD in order to have Plaintiff be falsely arrested with the knowledge and approval of Defendants JOSE NIEVES and EVELYN MATEO, who took no steps to attempt to prevent such from occurring.

75.   A number of documents provided thus far in discovery illustrate the extent to which Defendants MICHAEL FLANAGAN and ALEX BAKER (on information and belief with the knowledge and approval of Defendants JOSE NIEVES and EVELYN MATEO) and other MICHAEL MOES employees of TOYS "R" US were involved in joint activity with DETECTIVE ROGERS and other JOHN DOES members of the NYPD concerning the investigations conducted, and arrests made, with regard to the theft "ring" as a part of which Plaintiff was wrongfully arrested.

76.   In the case narrative for Person A that was authored by Defendant ALEX BAKER on 12/31/13, Defendant BAKER writes as follows:

> This store location (350 Baychester Ave Bronx, NY) was selected for investigation due to Asset Protection Specialist (APM) [Person A] suspected of allowing random guests to exit the store with large amounts of unpaid for merchandise.
>
> On 12/24/13 Regional Asset Protection Manager (RAPM) Alex Baker received an email from a Detective Brian

16

Deighan regarding possible internal theft.  In the email
it states that a group of Internal team members are
possibly involved in theft allowing people to exit the
building without paying for merchandise.  I immediately
tried to contact Detective Brian who was not available
until 12/27/13.  I reached out to Store Manager Jose
Nieves regarding this information and asked him if he
was aware of any suspicious activity with our APS.
Jose mentioned that he felt that both [Person A] and
APS [Person B] were acting a little suspicious the
other day.

Jose stated that he thought that both APS knew a guest
who was attempting to exit the store with unpaid for
merchandise.  Jose said that he did not have any proof
but felt like the two APS and the suspect who attempted
to exit the store were communicating with one another.
 I then reached out to Market Investigations
Manager (MIM) Mike Flanagan asking him if he dould help
me with this situation.  Mike was able to assign two of
his investigators Israel R. and Dominick for further
investigation.

Both Israel and Dominick began observation of the APS
on 12/23/13 at approximately 3 pm via the vehicle
located in the parking lot in front of the exit doors
of the Toys R Us location. Mike and I spoke via phone
at approximately 9 pm on 12/23/13.  Mike stated that
both investigators observed APS Jason allowing guests
to exit the building with unpaid for merchandise.  Mike
also stated that Israel and Dominick observed Jason
receive cash from these suspects once they exited the
building.  Based on this information I decided that I
wanted to speak with Jason regarding this information.
Mike and I decided to meet at the Toys R Us at 10:30 pm
on 12/23/13.  Mike and I met with Israel and Dominick
and recapped the details of the case.  Based on the
information discussed, Mike and I determined that we
needed to speak with Jason and immediately.

This interview was conducted on 12/23/13 inside of the
asset protection camera room office.  Mike was my
witness during this conversation.  Prior to
interviewing [Person A] I introduced myself and
explained that I wished to speak with him regarding
incidents that have occurred within the store. I asked
[Person A] if he would speak with me and he agreed.

I explained to [Person A] how loss occurs and
specifically told him the reasons why theft occurs. I
let him know that people make bad decisions from time
to time and that does not mean that they are bad
people. I explained in detail the rational [sic] for
employees causing a loss to the company and I asked him
to remember the company policies and procedures and to
remain honest with me while answering my questions.
Jason told me that he understood and that he would be
honest during the interview.  The following is recap of
the interview I conducted with [Person A].

I asked [Person A] if he allowed people to exit the
building without paying for merchandise.  [Person A]
said that he did.  Jason said that he has been doing
this for several months.  [Person A] said that he was
working with another APS named [Person B] and Team
Member Nicole Lyons.  [Person A] said that he had
relationships with several people who would come into
the store and steal.  [Person A] said that he would
text them while they were inside the store to let them
know when it was a good time to exit with the unpaid
for merchandise.  [Person A] said that he received some
of these peoples information from Nicole and [Person B]
as well.  [Person A] stated that the three of them
would work together to allow these people to exit with
approximately $800 worth of unpaid for merchandise
every time they came into the store. In return for
allowing these people to steal merchandise they would
give [Person A] $200 to $300 per trip.  [Person A] said
that he would allow these people to do this four or
five times per shift since the beginning of October.
[Person A] stated that he knows that he has caused a
loss to the company of at least $85,000 for allowing
these people to walk out of the store with the unpaid
for merchandise.  [Person A] also stated that he would
steal merchandise for himself. [Person A] would do this
by setting up merchandise near the door and would exit
with the unpaid for merchandise when no one was
looking. [Person A] stated that he had several items
inside of his car that he had stolen.  [Person A]
stated that he along with [Person B] and Nicole have
caused a loss of at least another $150,000 by allowing
guests to exit without paying for merchandise and
Nicole allowing guests to return merchandise that they
did not bring into the store (pick up return). [Person
A] stated that he knew this was wrong and against the
law.

18

I asked [Person A] if he would write a statement for me regarding his actions and the Information that we had discussed during the interview.  [Person A] agreed and Mike provided him with a Voluntary Statement Form.  In his statement [Person A] detailed his actions and indicated that he had committed the acts listed above. [Person A] determined that he had created a total loss to the company of over $85,000. Jason then signed his statement.

NYPD (4/5 precinct) was contacted on 12/24/13 at l am and arrived on scene approximately 15 minutes later, Mike and I explained to the arriving officer Mike Ligani that [Person A] had admitted to allowing people he knew to take over $85,000 of stolen merchandise and that he also had stolen merchandise inside of his vehicle.  Mike and I explained to officer Ligani that [Person A] gave us consent to search his vehicle to recover the stolen merchandise.  We asked office Ligani if this would be okay. Officer Ligani stated that it was okay so Mike, Dominick and Israel searched the vehicle and recovered another $884.58 worth of merchandise. Mike and I took pictures of all recovered merchandise and also make a training receipt of the product. Officer Ligani took [Person A] into custody and also took the original statements from [Person A] and Mike and the original copy of the training receipt used to determine the total dollar amount loss of merchandise [Person A] stole and placed into his vehicle. [Person A] left in the custody of Officer Ligani. MIM Mike Flanagan followed Ligani to the 4/5 precinct where he completed all of the required NYPD Investigation paperwork.

Video file is too large to upload to the APIS Reporting System so a hard copy has been retained at Mt. Olive DC in the case file.

77.   Defendant MICHAEL FLANAGAN's 12/22/13 handwritten memorialization of the interview with Person A (which is also denoted on that document as having occurred on 12/22/13) does not mention Plaintiff, however.  Defendant FLANAGAN's 12/22/13

19

handwritten memorialization of the interview with Person A states as follows:

> On 12/22 at 9:30 pm this writer along with RAPM Alex Baker interviewed API [Person A] out of store 6336 Bay Parkway [sic]. [Person A] admitted to allowing pushouts in exchange for cash since October 2013. He would receive $200 to $300 cash in exchange for letting merchandise through without paying. [Person A] admitted to letting $85,000 in merchandise past him. He also implicated [Person B] as being the ring leader and estimates [Person B] has let over 150K past him for friends over the past year. [Person A] conducted 4 pass throughs tonight in exchange for over $1000 in cash. [Person A] admitted to having more merchandise in his car and possibly at home. [Person A] has provided a written statement to Alex and this writer. NYPD has been called.

78.  Person A's handwritten statement to Defendants BAKER and FLANAGAN that is referenced above has not been produced to date by the TOYS "R" US Defendants.

79.  The "pick up" returns that are referenced in Defendant BAKER's 12/31/13 case narrative are impossible. A sales agent (at least at the TOYS "R" US store where Plaintiff worked) cannot return merchandise without either a receipt or a registry.

80.  Defendants DETECTIVE ROGERS and other JOHN DOES members of the NYPD sent internal NYPD documents to employees of TOYS "R" US, on information and belief to Defendants BAKER and FLANAGAN, including the arrest report for Person A, Person A's 12/24/13 mirandized written statement to Defendant DETECTIVE ROGERS, and an "unapproved" DD-5 report (NYPD Detective Division Complaint-Follow Up Informational Reports) by DETECTIVE ROGERS dated 12/24/13.

81.   The "unapproved" 12/24/13 DD-5 report by DETECTIVE
ROGERS lists as its Topic/Subject "Toys R Us Theft Ring."   Its
Summary of Investigation section states as follows:

>    1.   On December 24, 2013 at approximately 0600 hours
>    [Person A] was arrested inside of the 45 Precinct
>    Detective Squad after a joint investigation was
>    conducted with The Toys R US Market Investigation Team
>    and The 45 Precinct Detective Squad.
>
>    2.   On December 20, 2013 PO Deighan received an
>    anonymous phone call to the 45 Precinct Detective Squad
>    stating that a theft ring involving Toys R Us employees
>    was operating out of 350 Baychester Avenue in the
>    confines of the 45 Precinct.   The information was proven
>    factual enough in nature that a joint operation between
>    the 45 Precinct and The Toys R Us Legal Department was
>    conducted.
>
>    3.   [Person A] was escorted to the 45 Precinct Detective
>    Squad and waived his Miranda rights giving a full
>    statement in regards to his involvement in a
>    External/Internal Theft Ring.   [Person A] confessed in
>    sum and substance to the removal of approximately
>    $500,000 in merchandise from the Coop City Toys R Us
>    over The Holiday Season Rush.   [Person A] stated that
>    the thefts started in late October of this year and have
>    been a daily occurrence up to the present date.   [Person
>    A] stated that he himself oversaw the removal of over
>    $85,000 of merchandise and stated he received $200 per
>    pushcart through accumulating approximately $8,500 in US
>    currency.   [Person A] did have on his person $1,156 at
>    the time of his arrest that he gained from his
>    participation in the ring.

82.   Person A's 12/24/13 mirandized written statement to
Defendant DETECTIVE ROGERS falsely states that Plaintiff (and a
member of her family), in addition to others, was part of the
alleged theft ring.   Person A's 12/24/13 mirandized written
statement states as follows:

21

I am employed as a asset protection guard for Toys R Us located at 350 Baychester in the Bronx. I have worked for Toys R Us for 1 year 2 month. In late October I was approached by [Person B] who is also an asset protection guard. [Person B] told me I could make money by letting merchandise leave the store. Each time a team of people walked into the store they would fill up the empty shopping carts with merchandise and I would allow them to walk past without paying. I agreed to work for [Person B] and receive 200 per walk out from late October to present.  I have made $8,500 cash and have let approximately 85,000 or more in merchandise past me.  I work 3 to 4 push out each day I was working.  The internal crew that I work for has taken about 500,000 in merchandise from late October to December, which is considered the busy holiday season. The 2 workers from the crew from Toys R Us are [Person 2] who is the leader and Nicole Lyons, They have worked for the store for three years.  The three people who would pack the merchandise into the shopping cart and walk past are [Persons C, D, and E] and Nicole's [family member].  They would call or text me when the pushouts would occur and usually hit me off with $200.00 in the bathroom.  They also then return stolen merchandise and receive store credit from Nicole when she worked at customer service.

My Grandmother became very ill in october and was not getting better, My Grandmother passed away November 20, 2013, I lived with my Grandmother since the age of 16. I am a father 3 children ages 11, 8, 1, 1 daughter and 2 boys.  I pay child support for all my children, I am deeply sorry for my actions, deeply had I not been in this situation I would not have I would not committed such an offense.

I am writing the statement on my own free will. I was not threatened in any way, and I was not promised anything. I am cooperating with the NYPD because I am deeply sorry for my actions, I apologize honestly and sincere.

83.  On information and belief Person A falsely implicated

Plaintiff because he was told – by Defendants FLANAGAN, BAKER, and

DETECTIVE ROGERS - that if he implicated others who were involved
in the ring he would gain leniency for himself.

    84.  Another, updated, DD-5 report by DETECTIVE ROGERS, dated
12/27/15 further describes the joint operations engaged in by
Defendant FLANAGAN and other MICHAEL MOES employees of TOYS "R" US
and the DETECTIVE ROGERS and other JOHN DOES members of the NYPD's
45th Precinct Detective Squad.  That DD-5 report's Summary of
Investigation section states the updated information as follows:

>    1. On December 27, 2013, at approximately 1545 a search
>    warrant was conducted in which approximately 2000
>    dollars worth of stolen Toys R US video games was
>    recovered and an additional arrest was made in regards
>    to this case.
>
>    ...
>
>    *******Update*******
>    1. On December 26, 2013 at approximately 1800 I
>    received a call from the original anonymous caller who
>    informed PO Deighan of the theft ring.  The caller
>    stated that he knows where The Toys R US property is
>    being sold. The caller stated that there is only about
>    twenty video games left for sale in a deli grocery
>    store named [name provided] located at [address
>    provided] in Westchester County NY.  I immediately
>    safetynet the location under number [number provided].
>
>    2. On December 27, 2013 at approximately 1100 I
>    contacted The Westchester County Intelligence Center
>    and requested help form The Mount Vernon Police
>    Department in regards to the fencing location.  Robin
>    from the Intelligence Center put me in contact with
>    Captain Endinaro from The Mount Vernon Police
>    Department who informed me that Sgt Fegan and his
>    Narcotics Detectives would assist in the operation. I
>    then called Toys R US Investigations Michael Flanagan
>    who stated one of his team investigators would be
>    willing to make undercover purchases into the location.

3. At approximately 1300 Myself along with PO Deaghan went to The Mount Vernon Police Department Narcotics Unit with The Toys R US Investigations team. A undercover purchase was conducted yielding positive results for Toys R US stolen merchandise and a search warrant was obtained into the location.

4. The results of the search warrant was approximately 50 stolen v1deo games that where traced to The Toys R US in the confines of the 45 Precinct.  Other illegal contraband was also confiscated. The individual who sold the games to the undercover was pointed out and arrested. Defendant [redacted] DOB [redacted] who resides at [redacted] in the confines of the [redacted] Precinct will be prosecuted by The [redacted] County District Attorneys Office.

85.  A further DD-5 report by DETECTIVE ROGERS, dated 12/30/13 describes the circumstances of Plaintiff's arrest on 12/29/13.  That DD-5 report's Summary of Investigation section states (typos in original) as follows:

1.  On December 29, 2013 at approximately 1600 I received a phone call at the 45 PDS from Michael Flanagan (oys R Usmarket investigations manager); Mr. Flanagan advised me that he had contacted Nicole Lyons and asked her to come in to the Toys R Us store at 350 Baychester Avenue.  Mr. Flanagan further advised me that Nicole Lyons was present at the Toys R Us store and asked me to meet him at this location.  Once I was present at Toys R Us Mr. Flanagan showed me video from Tuesday 12/24/13 of two unknown subject described as a M/B and F/B removing items from the shelves at the oys R Usstore 350 Baychester Avenue and bringing the items directly to the returns desk without passing a point of sale.  At the returns desk the M/B and F/B unknown perpetrators did then give the stolen items to Nicole Lyons.  Ms. Lyons can be seen on video passing what appears to be gift cards to the perpetrators, who then exit the store.  Mr. Flanagan further states that there is video of the same two unknown perpetrators removing items from shelves and bringing them directly to the returns desk, manned by Nicole Lyons, at least a dozen

24

more times at earlier dates.  Detective Rogers, after
reviewing the video evidence from 12/24/13 and taking
into account the coconspirator ([Person A]) statements
implicating Ms. Lyons in this theft ring, took Ms.
Lyons Into custody and charged her with Grand Larceny
…. Ms. Lyons was removed to the 45 PDS for arrest
processing and questioning.

86.   A further DD-5 report by DETECTIVE ROGERS, also dated
12/30/13, states as follows concerning Plaintiff's arrest:

AT TPO DEFENDANT WAS ARRESTED AFTER THE INVESTIGATION
OF AN INTERNAL/EXTERNAL THEFT RING INSIDE OF TOYS R US.
THE DEFENDANT WAS OBSERVED APPROXIMATELY 90 TIMES ON
VIDEO AND REGISTER RETURNS ALLOWING THE SAME
UNAPPREHENDED DEFENDANTS RETURN MERCHANDISE FOR US
CURRENCY.  WHILE INVESTIGATING COMPLAINT NUMBER [number
given] A CONCURRENT INVESTIGATION BEGAN INTO THE SAME
THEFT RING FOR REFUND FRAUD. BOTH CASES ARE BEING
INVESTIGATED UNDER CASE NUMBER [number given].

87.   Defendants JOSE NIEVES, Store Manager, EVELYN MATEO,
Assistant Store Manager, MICHAEL FLANAGAN, Market Investigator,
ALEX BAKER, Regional Asset Protection Manager, and MICHAEL MOES
acted under color of law in that they willfully participated jointly
with members of the NYPD, and members of the NYPD arrested Plaintiff
based on statements made by TOYS "R" US employees, including
defendants JOSE NIEVES, Store Manager, EVELYN MATEO, Assistant
Store Manager, MICHAEL FLANAGAN, Market Investigator, ALEX BAKER,
Regional Asset Protection Manager, and MICHAEL MOES, without
conducting any independent or honest investigation, and granting
undue deference to the narrative(s) provided by the TOYS "R" US
employees.

88.   Defendant TOYS "R" US, by and through its agents, servants

and/or employees, including defendants JOSE NIEVES, Store Manager, EVELYN MATEO, Assistant Store Manager, MICHAEL FLANAGAN, Market Investigator, ALEX BAKER, Regional Asset Protection Manager, and MICHAEL MOES, willfully participated in joint activity with defendant CITY, its agents, servants and/or employees, in having Plaintiff arrested and imprisoned, and in attempting to have charges filed against Plaintiff, without justification, privilege, or probable cause.

89. Based on the instigation, importuning, and encouragement by defendant TOYS "R" US, its agents, servants and/or employees, including defendants JOSE NIEVES, Store Manager, EVELYN MATEO, Assistant Store Manager, MICHAEL FLANAGAN, Market Investigator, ALEX BAKER, Regional Asset Protection Manager, and MICHAEL MOES, and without first conducting any reasonable or honest inquiry or investigation, defendants POLICE DETECTIVE ROBERT ROGERS, JOHN DOE #1, and JOHN DOE #2, intentionally and with deliberate indifference to Plaintiff's civil rights arrested Plaintiff, and attempted to cause criminal charges to be lodged against her.

90. As a result of the collective acts of defendant CITY, its agents, servants and/or employees, including defendants POLICE DETECTIVE ROBERT ROGERS, JOHN DOE DETECTIVE #1, JOHN DOE DETECTIVE #2, JOHN DOES, and RICHARD ROES, and defendant TOYS "R" US, its agents, servants and/or employees, including defendants JOSE NIEVES, Store Manager, EVELYN MATEO, Assistant Store Manager, MICHAEL FLANAGAN, Market Investigator, ALEX BAKER, Regional Asset

26

Protection Manager, and MICHAEL MOES, plaintiff sustained loss of liberty, and suffered emotional distress, and has otherwise been damaged.

## FIRST CLAIM

### DEPRIVATION OF RIGHTS UNDER THE
### UNITED STATES CONSTITUTION AND 42 U.S.C. §1983

91.  The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

92.  By their conduct and actions in detaining, searching, seizing, assaulting and battering, arresting, abusing process against, violating rights to due process of, inflicting emotional distress upon, failing to intercede on behalf of, and in fabricating or attempting to fabricate evidence against Plaintiff, the individual defendants, acting both on their own and in conspiracy with each other, intentionally, maliciously, and with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, caused damage and injury in violation of the plaintiff's Constitutional rights as guaranteed under 42 U.S.C. §1983 and the United States Constitution, including its Fourth and Fourteenth Amendments.

93.  As a result of the foregoing, plaintiff was deprived of her liberty, suffered psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged

27

and injured.

## SECOND CLAIM

### SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. §1983

94.   The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

95.   By failing to remedy the wrongs committed by their subordinates, and in failing to properly train, screen, supervise, or discipline their subordinates, supervisory individuals / officers RICHARD ROES and JOSE NIEVES, Store Manager, EVELYN MATEO, Assistant Store Manager, ALEX BAKER, Regional Asset Protection Manager, and those other MICHAEL MOES who exercised supervisory responsibilities, caused damage and injury in violation of plaintiff's rights guaranteed under 42 U.S.C. §1983, and the United States Constitution, including its Fourth and Fourteenth amendments.

96.   As a result of the foregoing, plaintiff was deprived of her liberty, suffered psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## THIRD CLAIM

### LIABILITY OF THE CITY OF NEW YORK AND TOYS "R" US FOR CONSTITUTIONAL VIOLATIONS

28

97.   The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

98.   At all times material to this complaint, defendant THE CITY OF NEW YORK, acting through its police department, and through the individual defendants had de facto policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein.

99.   At all times material to this complaint, defendant THE CITY OF NEW YORK, acting through its police department, and through the individual defendants, had de facto policies, practices, customs, and usages of failing to properly train, screen, supervise, or discipline employees and police officers, and of failing to inform the individual defendants' supervisors of their need to train, screen, supervise or discipline said defendants.   These policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

100.   The misconduct detailed above was also the result of an institutional policy, practice, and/or custom of defendant CITY whereby NYPD officers in circumstances such as that described above are discouraged from making further inquiry or investigation prior to arresting a subject other than receiving information from the personnel at retail and other business establishments as to

allegations of theft by employees or members of the public, which is given undue deference.

101. Defendant CITY authorized and tolerated as institutionalized practices, and ratified the misconduct detailed above, by failing to take adequate precautions in the supervision and/or training of police personnel, including specifically defendants POLICE DETECTIVE ROBERT ROGERS, JOHN DOE #1, JOHN DOE #2, and JOHN DOES.

102. The defendant CITY's policies/customs and defendant CITY's failure to supervise and/or train its employees, including defendants Police Officers POLICE DETECTIVE ROBERT ROGERS, JOHN DOE #1, JOHN DOE #2, and JOHN DOES rose to the level of deliberate indifference to the consequences of its actions, and indifference to plaintiff's rights, privileges and immunities secured by the Constitution of the United States of America, inter alia, plaintiff's Fourth and Fourteenth Amendment rights.

103. At all times material to this complaint, defendant TOYS "R" US, acting through its employees and agents, and through the individual defendants had de facto policies, practices, customs and usages, including acting in conspiracy and conjunction with employees and agents of the City of New York concerning the aforementioned unconstitutional policies, practices, customs, and usages, which were a direct and proximate cause of the unconstitutional conduct alleged herein.

30

104.   At all times material to this complaint, defendant TOYS "R" US, acting through its employees and agents (including its managerial staff and security personnel), and through the individual defendants, had de facto policies, practices, customs, and usages of failing to properly train, screen, supervise, or discipline its employees and agents, and of failing to inform the individual defendants' supervisors of their need to train, screen, supervise or discipline said employees and agents.  These policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

105.   As a result of the foregoing, plaintiff was deprived of her liberty, suffered psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

### FOURTH CLAIM

### RESPONDEAT SUPERIOR LIABILITY OF TOYS "R" US FOR DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983

106.   The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

107.   The conduct of defendants JOSE NIEVES, Store Manager, EVELYN MATEO, Assistant Store Manager, MICHAEL FLANAGAN, Market Investigator, ALEX BAKER, Regional Asset Protection Manager, and MICHAEL MOES alleged herein, occurred while they were on duty

31

and/or in uniform, and/or in and during the course and scope of their duties and functions as managerial, retail and / or security employees in the management and maintenance of TOYS "R" US, and/or while they were acting under color of state law as agents of defendant TOYS "R" US and/or while they were acting under color of state law through conspiracy with officers and/or officials of THE CITY OF NEW YORK, and, as a result, defendant TOYS "R" US is liable to the plaintiff pursuant to the doctrine of respondeat superior for deprivation of rights under the United States Constitution and 42 U.S.C. § 1983.

108.   As a result of the foregoing, plaintiff was deprived of her liberty, suffered psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## FIFTH CLAIM

## RESPONDEAT SUPERIOR LIABILITY OF THE CITY OF NEW YORK AND TOYS "R" US FOR STATE LAW VIOLATIONS

109. The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

110. The conduct of the individual defendants alleged herein, occurred while they were on duty and in uniform, and/or in and during the course and scope of their duties and functions as New York City police officers, and/or while they were acting

32

as agents and employees of the defendant THE CITY OF NEW YORK, and, as a result, the defendant THE CITY OF NEW YORK is liable to the plaintiff pursuant to the state common law doctrine of respondeat superior.

111. The conduct of the individual defendants alleged herein, occurred while they were on duty and/or in uniform, and/or in and during the course and scope of their duties and functions as managerial, retail, and/or security personnel in the management and maintenance of TOYS "R" US, and, as a result, defendant TOYS "R" US is liable to the plaintiff pursuant to the state common law doctrine of respondeat superior.

112.  As a result of the foregoing, plaintiff was deprived of her liberty, suffered psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## SIXTH CLAIM

### ASSAULT AND BATTERY

113. The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

114. By the actions described above, defendants did inflict assault and battery upon plaintiff.  The acts and conduct of defendants were the direct and proximate cause of injury and damage to plaintiff and violated her statutory and common law

33

rights as guaranteed by the laws and Constitution of the State of New York.

115.  As a result of the foregoing, plaintiff was deprived of her liberty, suffered psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## SEVENTH CLAIM

### FALSE ARREST AND IMPRISONMENT

116. The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

117. By the actions described above, defendants caused to be falsely arrested and imprisoned or falsely arrested and imprisoned plaintiff, without reasonable or probable cause, illegally and without a warrant, and without any right or authority to do so.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

118.  As a result of the foregoing, plaintiff was deprived of her liberty, suffered psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## EIGHTH CLAIM

34

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

119. The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

120. By the actions described above, defendants engaged in extreme and outrageous conduct, which intentionally caused severe emotional distress to plaintiff.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

121.  As a result of the foregoing, plaintiff was deprived of her liberty, suffered psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

**<u>NINTH CLAIM</u>**

**ABUSE OF PROCESS**

122. The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

123. By the conduct and actions described above, defendants employed regularly issued process against plaintiff compelling the performance or forbearance of prescribed acts.  The purpose of activating the process was intent to harm plaintiff without

economic or social excuse or justification, and the defendants were seeking a collateral advantage or corresponding detriment to plaintiff which was outside the legitimate ends of the process. The acts and conduct of defendants were the direct and proximate cause of injury and damage to plaintiff and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

124.  As a result of the foregoing, plaintiff was deprived of her liberty, suffered psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## TENTH CLAIM

### TRESPASS

125. The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

126. By the actions described above, defendants willfully, wrongfully and unlawfully trespassed upon the person of plaintiff.

127.  As a result of the foregoing, plaintiff was deprived of her liberty, suffered psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## ELEVENTH CLAIM

36

**NEGLIGENCE**

128. The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

129. Defendants, jointly and severally, negligently caused injuries, emotional distress and damage to the plaintiff. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

130. As a result of the foregoing, plaintiff was deprived of her liberty, suffered psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

**TWELFTH CLAIM**

**NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION AND TRAINING**

131. The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

132. Defendants negligently hired, screened, retained, supervised and trained the individual defendants who were in their employ. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated her statutory and common law rights as guaranteed by

37

the laws and Constitution of the State of New York.

133.  As a result of the foregoing, plaintiff was deprived of her liberty, suffered psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## THIRTEENTH CLAIM

### CONSTITUTIONAL TORT

134. The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

135. Defendants, acting under color of law, violated plaintiff's rights pursuant to Article I, §§ 6 and 12 of the New York State Constitution.

136. A damages remedy here is necessary to effectuate the purposes of §§ 6 and 12 of the New York State Constitution, and appropriate to ensure full realization of plaintiff's rights under those sections.

137.  As a result of the foregoing, plaintiff was deprived of her liberty, suffered psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

WHEREFORE, the plaintiff demands the following relief jointly and severally against all of the defendants:

        a.   Compensatory damages;

        b.   Punitive damages;

        c.   The convening and empanelling of a jury to consider the merits of the claims herein;

        d.   Costs and interest and attorney's fees;

        e.   Such other and further relief as this court may deem appropriate and equitable.


Dated:     New York, New York
           June 1, 2015

                              _____/S/_____
                              Jeffrey Rothman, Esq.
                              315 Broadway, Suite 200
                              New York, New York 10007
                              (212) 227-2980

                              Attorney for Plaintiff